FILED
U.S. DISTRICT COURT
DISTRICT OF COLORADO

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

2017 NOV 30    AM 9:38

JEFFREY P. COLWELL
CLERK

BY_____DEP. CLK

**TANIQUE WRIGHT,**
　　　17019 Blue Mist Grove
　　　Monument, Colorado 80132

**Plaintiff,**

v.

**'17 -CV-02866**

**WILLIAM MORRIS ENDEAVOR, a/k/a**
　　　WME Entertainment Parent, LLC
　　　9601 Wilshire Boulevard, 3rd Floor
　　　Beverly Hill, California 90210

Civil Action No. _____

　　　and

**PROFESSIONAL BULL RIDERS, LLC,**
　　　101 W. Riverwalk
　　　Pueblo, Colorado 81003

**Defendants.**

## PLAINTIFF TANIQUE WRIGHT'S CIVIL COMPLAINT

### Introduction

Plaintiff Tanique Wright herein files suit against defendants William Morris Endeavor, a/k/a WME Entertainment Parent, LLC and Professional Bull Riders, LLC for causes of action stated as follows:

### Parties

1.　　Plaintiff Tanique Wright is resident of Colorado and an employee of Defendant Professional Bull Riders (PBR)

2.      Defendant William Morris Endeavor (WME) is a talent agency headquartered in Beverly Hills, California.

3.      Defendant Professional Bull Riders is a professional bull riding organization based in Pueblo, Colorado.

4.      PBR has approximately 125 employees.

5.      PBR is a wholly owned subsidiary of WME.

**Jurisdiction**

6.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as it asserts a claim that arises under the Constitution, laws, or treaties of the United States. Specifically, under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) et seq. (Title VII), The Equal Pay Act of 1963 (EPA), 29 U.S.C. § 206(d).

7.      Venue in this district is appropriate because it is the judicial district in which the unlawful practices are alleged to have been committed. It is also the judicial district where the records relevant to Wright's claims are maintained and administered.

**Factual Allegations**

*Wright is hired by PBR*

8.      Wright is 40 years old.

9.      Wright is an African American.

10.     Wright is a woman.

11.     Wright earned her Bachelor's degree in Management in 2008.

12.     Wright has been a human resources (HR) professional for over seventeen years.

13.     In 2015, Wright applied for an HR position with PBR. She was interviewed by the former HR director from PBR, an HR VP of WME, PBR CEO Sean Gleason, and PBR COO Rodd Granger. Wright also spoke with WME Chief of HR, Carole Katz.

14.     During the interview process, Wright told Granger and Gleason about her work philosophy and that she was not a "yes person for HR," but a "resource for the employees." She further stated that "if that's not what you are looking for, don't hire me. That's just not who I am."

15.     Wright was hired as Vice President of HR and Operations, and began working for PBR on September 28, 2015.

16.     As VP of HR, Wright also served on the thirteen-person Executive Leadership Team (ELT), which manages PBR.

17.     Wright was the only African American on the ELT and one of only two African American employees of PBR.

*Wright begins working at PBR*

18.     From the beginning of her employment with PBR, management treated Wright differently than other employees, specifically the senior management team.

19.     Despite stating that he wanted a business partnership with the HR department, Gleason refused to meet with Wright directly. Instead, Gleason referred her to Granger for approval on all HR initiatives and any questions on formulating the performance goals of the HR department. These included questions or meetings related to employee terminations, employee relation issues, budgets, holiday closures, and workforce recruitment.

20.     Despite being a member of the ELT and senior management, neither Granger nor anyone else ever asked Wright to join senior management team meetings.

21.     When Wright inquired as to the reason she was excluded, she received various excuses that either were not true or did not make sense. For example:

    a.  Granger stated that the meetings were for Senior Vice Presidents only, not Vice Presidents. However, Wright observed several Vice Presidents attending the meetings.

    b.  Granger stated that "we don't really discuss HR matters in these meetings; you don't need to attend." This did not make sense because Wright oversaw the Travel department, facilities department, and the "sign shop" (printing of advertisements for sponsors).

22.     Wright was also the only SVP or VP that did not receive the staffing requested for their team.

23.     The other members of the ELT all had at least one direct report to assist them:

    a.  John Sohigian, VP of Licensing, had one direct report.

    b.  Chris Gallina, VP of Finance, had four direct reports.

    c.  Dan Hickman, VP of Production, had nine direct reports.

    d.  Chad Blankenship, SVP of Marketing Outreach had six direct reports.

    e.  Ellen Newberg, SVP of Event Marketing, had five direct reports.

    f.  Jon Sager, SVP of IT, had six direct reports.

    g.  David Cordovano, SVP of Event Tours, had two direct reports.

    h.  Mark Nolan, SVP of National Sales, had four direct reports.

    i.  Melissa Hendricks, VP of Competition, had four direct reports.

24.    Wright requested three employees for her team: one for travel support, one for HR support, and one for facilities support.

25.    PBR did not approve Wright's request for any direct reports.

26.    To get the support and assistance she needed, Wright had to ask for help from the direct reports of the other ELT members. These other direct reports only had limited time to spend on her tasks.

27.    Granger was Wright's performance evaluator.

28.    Granger made a point of never responding to Wright's emails.

29.    Other members of the ELT also made a point to never respond to Wright's emails.

    a.  For example, Hickman would never respond to Wright's communications.

30.    When Wright asked Granger to urge the other ELT members to collaborate with her, Granger told Wright to "lurk outside Dan's office and stalk him."

31.    Despite issuing Wright's performance evaluations and approving her annual bonuses, Granger never met with Wright in person to discuss her performance goals or the evaluations he issued.

32.    Wright followed up with Granger to discuss her performance goals; he dismissed her efforts, stating that if she did her job and stayed under budget, he would have no problems with her.

*Granger micromanages Wright's schedule*

33.    Granger required Wright to notify him of minimal shift changes, including when Wright would need to arrive later in the morning, or leave earlier in the evening.

34.    For example, after a schedule change while Wright was traveling for a career fair, Granger called Wright and reprimanded her for not immediately informing him of the change.

35.    In fact, Wright had emailed Granger regarding the change at least a week prior.

36.    Granger did not require other employees at any level to notify him of minimal shift changes.

37.    For example, Sohigian and Gallina told Wright they did not have to inform Granger of their movements so long as they completed their work.

38.    Granger told Wright that she was not permitted to put on "Out of Office" auto-reply message on her email account when she took leave. Other members of the ELT were allowed to use "Out of Office" auto-reply messages on their emails.

39.    On every vacation Wright has taken since starting at PBR, she has been required to working during part or all of her leave time.

40.    While some other ELT members also worked during vacation from time to time, this impacted Wright more consistently than anyone else on the ELT.

41.    As the chief HR representative, it is Wright's responsibility to help complete payroll for the entire staff of PBR.

*Wright is paid less than her male counterparts*

42.    In performing her payroll responsibilities, Wright learned that she was one of the lowest-paid members of the ELT who had direct reports.

43.

44.    The only ELT employee with direct reports paid less than Wright is also a woman, Melissa Hendricks.

45.

46.    Hendricks holds a VP position, but Hendricks is a VP in name only and does not have the same responsibility as other VPs. In exchange for not being able to offer Hendricks a higher salary, PBR agreed to give her a VP title..

47.    Despite meeting all of her performance goals, Wright was awarded the lowest bonus of the ELT for 2016.

48.    In early July 2017, Senior Director Jeff Snyder informed Wright that other members of the senior management team referred to her as the "PBR token" because she was the only African American on the ELT.

*Wright complains of Racial Discrimination*

49.    In May 2017, Wright scheduled a meeting with Hayley Macon, WME VP of Employment Law, and Jessica Mefford, WME SVP of Global Human Resources, to discuss her disparate treatment at PBR.

50.    Wright did not inform Macon or Mefford of the reason for the meeting in advance.

51.    Wright met with Macon and Mefford in person at WME headquarters in California on May 24, 2017.

52.    During the meeting, Wright filed a formal complaint against Gleason and Granger for race and gender discrimination.

53.    Macon and Mefford assured Wright that a confidential and swift external investigation into her claims would be conducted.

*PBR and WME retaliate against Wright*

54.    A few days after Wright met with Macon and Mefford, on June 8, 2017, she received a call from Katz, who reprimanded Wright for not coming straight to her.

55.    Wright responded that while she rarely spoke with Katz, she had a close working relationship with Macon and Mefford and felt more comfortable speaking with them first.

56.    Katz called Wright on or about July 27, 2017 to discuss the following changes to her terms of employment with PBR:

a.    Wright no longer reported to Granger. She would instead report to Katz directly.

b.    Wright would be required to request leave three weeks in advance. General PBR policy is two-week notice if possible, and there is no specified time period for advanced notice for exempt employees, which Wright is. Prior to this, Wright informed Granger at least one week prior to taking leave and never received any counseling.

c.    Wright would no longer be permitted to work remotely. Wright had previously only worked from home three to four times per month.

d.    The entire ELT, including Granger and Gleason, are permitted to work remotely. Granger typically worked remotely every Monday and Friday to accommodate his travel schedule.

    e. Wright was required to be in the PBR offices during the core business hours of 8:00 a.m. to 5:00 p.m. Wright previously had a flexible arrival time for any time between 7:00 a.m. and 9:00 a.m., as did the entire ELT.

    f. Katz told Wright to review PBR's attendance and leave policies to ensure she followed all the rules.

    g. Katz told Wright she would have to seek her approval before traveling on behalf of PBR

    h. Katz told Wright she would be responsible for the HR budget moving forward not Wright.

57. The changes took effect immediately.

58. There were no performance or behavioral considerations cited for the above changes in Wright's terms of employment.

59. In the months following her complaint to Macon and Mefford, PBR retaliated against Wright by removing her responsibilities and refusing to consult her on decisions that are directly within the purview of HR.

60. The affected responsibilities include:

    a. Wright no longer received calls or emails (after early August) from other peers, who prior to my discrimination claims were in contact with me on a regular basis: Jon Sager, Mark Nolan, Jason Brewer, Elyse Kazam,

or David Cordovano . Prior to Wright's discrimination claim when Nolan traveled to the CO office from the NY office he would always notify Wright so they could meet.  Nolan has traveled to CO multiple times after Wright filed her discrimination claim and he has never notified her.

b.  Jackie Len removed Wright from creating an Employment Agreement for Jay Daugherty, Executive Director of ABBI, which is a subsidiary of PBR. Previously, Wright had been responsible for drafting all employee agreements for ABBI.WME and PBR management excluded Wright from meetings to discuss processing and managing the U.S. visa and work permit process. As VP of HR, this had previously been Wright's responsibility. Further, visas were usually discussed in senior management team meetings and, more specifically, the meetings to discuss the Global Cup event, which is the world championship competition for bull riding. It is organized by PBR and is set to take place outside the United States . Wright was not invited to those meetings but her Travel Manager was invited to these meetings

c.  Despite being responsible for PBR Canada, no one notified Wright of lay-offs in the PBR Canada office for Jill Moore and Chris Bell.

d.  WME and PBR management did not consult Wright on employee relations issues.

e.  For example, Wright conducted an exit interview with a female employee, Janna Patterson, on September 8, 2017. Patterson brought up the issues she had been having with her manager, Chris Bell. Wright proceeded to probe Patterson for information to fully understand her concerns. Patterson became confused as to why Wright was asking her questions. It turned out Patterson had already spoken to Gleason and Cordovano regarding her concerns. Neither Gleason nor Cordovano had mentioned Paterson's complaint to Wright. As VP of HR, it is Wright's responsibility to look into employee concerns regarding relations with their colleagues or managers.

f.  On or about August 24, 2017, WME and PBR management failed to consult Wright on a termination decision. Wright had previously handled all PBR terminations personally since 2015.

g.  On or about September 14, 2017, Gallina and Blankenship informed Wright that an employee, Kevin McCoy, was transferring from his current position to a separate, existing open position. Galina and Blankenship said that the transfer would take effect the following Monday, September 18, 2017, and that it had already been approved

by Granger and Gleason. Prior to making her complaint of discrimination, Wright would have been notified of the transfer well in advance in order to obtain the required approvals and update the employee's information in personnel records.

h.  On or about September 14, 2017, Wright's Facilities Manager advised her that Blankenship had emailed him and IT about a new employee's start date. Blankenship left HR off the email. Prior to making her complaint of discrimination, Wright handled the entire onboarding process for new employees, including the notification to IT to add the employee to the system. Blankenship purposefully cut Wright out of the process.

i.  On or about September 14, 2017, Wright's HR Coordinator came to her office to get details about Travis Connelly's termination.  Connelly had applied for unemployment and the state of Colorado wanted to know if PBR provided any vacation or severance pay upon his separation. Wright went to Mefford for the necessary details, since she had been cut out of Connelly's termination process and was not aware of the terms of his separation. Mefford completed the unemployment paperwork. Prior to making her complaint of discrimination, Wright

had been responsible for filling out unemployment claims for all former employees.

j.  On or about October 4, 2017, Wright received an automatic notification from her HR system that another employee, Pedro Lopez, had been terminated. No one contacted her regarding the termination, nor did anyone consult her regarding the off-boarding process. Prior to making her complaint of discrimination, Wright was part of all termination decisions.

k.  On or about September 15, Mike Giguere contacted Wright about creating a separation agreement for Jill Van Edmond for RRF (Rider Relief Fund) Wright was notified by Jackie Len that she would be taking over the separation agreement for Jill.  Prior to Wright's compliant she handled separation agreements for RRF, PBR and ABBI.

l.  Wright was notified on November 27, 2017 that the CEO's Executive Admin Nicole Spengler last day of employment was Dec 1.  Nicole gave notice in early November. Wright was never told about her resignation.  Prior to my compliant Wright was always notified of employee resignations.

61.    Jackie Len, WME Associate General Counsel, reprimanded Wright, stating that she needed to "be a better HR business partner" to Gleason and Granger. Prior to this statement, Len had never provided negative feedback about Wright, despite the fact that the two spoke with each other weekly for over eight months.

62.    On or about August 2, 2017, Katz falsely accused Wright of using her corporate credit card for personal expenses.

63.    Wright has never used her corporate credit card for personal expenses.

64.    Katz accused Wright of being insubordinate because she worked remotely. PBR's policy allows for employees to work remotely.

65.    Mark Shapiro, COO for WME, visited PBR's headquarters in Pueblo, Colorado on or about May 29, 2017. During his visit, Shapiro took all members of the ELT to dinner except for Wright.

66.    Further, Gleason, who previously refused to meet with Wright or any other member of her team, began meeting directly with Wright's travel manager, Melissa Patterson.

*Defendants conduct an internal investigation*

67.    Beginning in late June 2017, almost a month after Wright filed her formal complaint of discrimination, WME launched an internal investigation into Wright's claims.

68.    Len led the investigation.

69. Len interviewed Wright on July 13, 2017.

70. Len was dismissive of Wright's complaint.

71. Len failed to interview any witnesses Wright suggested, aside from briefly speaking with Jeff Snyder.

72. On August 11, 2017, Katz emailed Wright stating that after conducting an internal investigation, WME found Wright's complaints to be unsubstantiated.

73. On August 23, Wright filed an EEOC complaint against PBR alleging race and gender discrimination.

*A Just Cause*

74. Wright has volunteered at A Just Cause (AJC), a non-profit civil advocacy group focused on battling injustice in American society, since October 2013. AJC is a justice advocacy group seeking true balance and accountability in the judicial process.

75. Wright performs research and analysis for AJC in her spare time.

76. As VP of HR, one of Wright's job responsibilities was recruitment.

77. Having been a longtime volunteer with AJC, Wright was aware of the ratings received by their radio broadcasts.

78. On or about December 2015 or January 2016, Wright asked Granger if she could use part of the PBR recruitment budget to run advertisements during AJC broadcasts.

79. Wright explained to Granger that she was a volunteer with AJC and that she wanted to avoid any perceived conflict of interest issues. Wright made it clear that, if PBR had a problem with her association with AJC, that she would not use PBR funds to place advertisements on AJC broadcasts.

80. Granger's responded, "It's your budget, so do what you want."

81. .

82. PBR donated event tickets to Grangers children's school and to the non-profit organization Granger volunteers for.

83. PBR sponsored Gallina in a race for his child's school.

84. Wright used approximately $7,000.00 of her recruitment budget to place periodic radio ads with AJC's broadcasts.

85. Wright also used the recruitment budget to pay recruiters to find qualified candidates for PBR, to place advertisements on Craigslist, and to place advertisements on LinkedIn.

86. After filing her internal complaint of discrimination in May 2017, Wright spoke with the AJC Executive Director in early June 2017. She expressed how hopeless she felt about the ongoing discrimination at PBR.

87. AJC suggested that they could assist Wright in her plight.

88. AJC then interviewed Wright on their radio show, posted an online article, and tweeted statements on the social medial platform Twitter about the

discrimination Wright had faced at PBR. All of these actions occurred in or around late August 2017 and early September 2017.

89. In the interview, Wright detailed how she has been an asset to PBR and how, instead of praise and collaboration, she has faced racism and sexism in the workplace. Wright stated that she was the lowest-paid member on the executive team and is micromanaged in a way her colleagues are not.

90. The statements Wright made to AJC do not include any of PBR or WME's trade secrets, confidential or personnel information, or any other category of information prohibited by the company's media and confidentiality policies.

91. Wright has faced retaliation at PBR due to AJC's efforts on her behalf to combat discrimination.

92. On August 23, 2017, Gleason called a meeting between himself, Wright, and John O'Hara, PBR Counsel.

93. Gleason stated that he had received Wright's July 2017 EEOC complaint, but that the meeting was called to discuss Wright's involvement with AJC.

94. Gleason became visibly upset and aggressive and began yelling at Wright over AJC's tweets, online article, and radio interview.

95. Gleason screamed that he had a company to run and the tweets from AJC were not good for PBR. He also began yelling different twitter handles and asked Wright if she knew the individuals associated with the handles.

96. Macon also threated to sue Wright and to terminate her over the AJC tweets.

97. Wright remained professional in the face of Gleason's tirade, calmly responding to his questions. However, Gleason became so verbally abusive that Wright felt physically threatened, and was forced to walk out of the meeting.

98. The following day, August 24, 2017, Wright received a call from Katz asserting that Wright had acted inappropriate and hostile in her meeting with Gleason.

99. After the exposure by AJC, Julie Sroka from the legal department baselessly accused Wright of breaking PBR's media policy.

100. WME's communications policy requires employees to obtain approval before making any public comment on behalf of the company. The policy also urges that employees refrain from making public statements regarding the company without prior approval, but does not identify doing so as a fireable offense.

101. The communications policy does not address statements made by individuals on behalf of themselves, such as Wright's statements to AJC.

102. Sroka also accused Wright of having a conflict of interest because Wright was in charge of paid recruitment advertising.

103. Sroka stated that WME was initiating an investigation into Wright's decision to place radio advertisements with AJC in violation of the media and marketing policy because Granger instructed Sroka to do so. This was the first time Wright

had been informed of a media and marketing policy for recruitment advertisements.

*PBR hires an outside investigator*

104. In or about early September 2017, WME hired Carol Merchasin to conduct an independent investigation into Wright's claims. Merchasin is a retired attorney.

105. Wright met with Merchasin for approximately three hours on September 5, 2017.

106. Wright described in detail the discrimination and retaliation she had experienced at PBR to Merchasin and believed the meeting had gone well.

107. On September 7, 2017, Wright met with Merchasin again.

108. During this meeting, Merchasin presented Wright with a flyer AJC had distributed about Wright's situation and then proceeded to deliver a profanity-laced tirade against Wright stating that "this s*** is ruining your case." Merchasin also stated "this s*** is all lies" and that she understood why WME was retaliating against Wright. Merchasin further stated that WME had the right to sue her and AJC for slander.

109. Merchasin went through each bullet point on the AJC flyer and told Wright that any reasonable person would consider them lies and wright should be upset with AJC for "making things worse for you."

110. Merchasin was referring to the flyer created by AJC on Wright's behalf.

111. Merchasin also stated that since WME was paying her to conduct this investigation, Merchasin did not have to share her investigative report with Wright.

112. Wright has never seen any report of investigation.

113. On September 29, 2017, Katz emailed Wright to set up a meeting to discuss "the outcome of the investigation, as well as other issues regarding your work with PBR."

## COUNT I
### Title VII (Sex Discrimination)
### Against All Defendants
### 42 U.S.C. § 2000e-2 and 29 U.S.C. § 623

114. Wright incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

115. Defendants, through its managers, unlawfully subjected Wright to and tolerated discrimination against Wright because of her sex.

116. Defendants, through their managers, repeatedly discriminated against Wright, at least in part, because of her sex, by excluding her from duties she should have performed in attempts to exclude and marginalize her.

117. Defendants, through their managers, repeatedly discriminated against Wright, at least in part, because of her sex, by altering her terms of employment and holding her to a higher standard than her male colleagues.

118. Defendants, through their managers, accompanied these efforts to exclude and marginalize Wright with repeated instances of bullying.

119. Defendants did not stop or remedy the continuous bullying from the males on the Executive Management Team and did not discipline Wright's colleagues and managers for engaging in this behavior.

120. These adverse actions occurred under circumstances that raise a reasonable inference of unlawful discrimination based on Wright's sex.

121. Because several of the people discriminating against Wright were managers at PBR and Wright complained of the discriminatory behavior to her managers at WME, who shared those complaints with the managers at PBR, Defendants had knowledge of the discrimination against Wright.

122. Wright sustained damages as the result of Defendants illegal discrimination in violation of Title VII, including, but not limited to, lost opportunity to increase her wages, lost bonuses, lost opportunity to increase her bonuses, damage to her career, and emotional, mental, and physical distress and anxiety.

123. Wright is entitled to such legal or equitable relief as will effectuate the purposes of Title VII, including but not limited to economic and compensatory damages, and reasonable costs and attorneys' fees.

**COUNT II**
**Race Discrimination**
**Against All Defendants**

**42 U.S.C. § 2000e-2**
**42 U.S.C. § 1981**

124.    Plaintiff Wright re-alleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs.

125.    Defendants, through their managers, unlawfully subjected Wright to discrimination and tolerated discrimination against Wright because of her race.

126.    Defendants, through their managers, repeatedly discriminated against Wright at least in part because of her race by excluding her from duties she should have performed in attempts to exclude and marginalize her.

127.    Defendants, through their managers, repeatedly discriminated against Wright at least in part because of her race by altering her terms of employment and holding her to a higher standard than her white colleagues.

128.    Defendants, through its managers, accompanied these efforts to exclude and marginalize Wright with repeated instances of bullying.

129.    Defendants did not stop or remedy the continuous bullying from the white employees on the Executive Management Team and did not discipline Wright's colleagues and managers for engaging in this behavior.

130.    These adverse actions occurred under circumstances that raise a reasonable inference of unlawful discrimination based on Wright's race. For example, members of the ELT referred to Wright as PBR's "token" on the ELT.

131. Because several of the people discriminating against Wright were managers at PBR and Wright complained of the discriminatory behavior to her managers at WME, who shared those complaints with the managers at PBR, Defendants had knowledge of the discrimination against Wright.

132. Wright has sustained damages as the result of Defendant's illegal discrimination in violation of Title VII and Section 1981, including, but not limited to, lost wages, lost bonuses, damage to her career, and emotional, mental, and physical distress and anxiety.

133. Wright is entitled to such legal or equitable relief as will effectuate the purposes of Title VII and Section 1981, including but not limited to economic and compensatory damages, punitive damages, and reasonable costs and attorneys' fees.

**COUNT III**
**Retaliation**
**Against All Defendants**
**Title VII of Civil Rights Act of 1964,**
**42 U.S.C. § 2000e-3,** *et seq.*

134. Wright hereby incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

135. Wright is a "person" and an "employee," and Nationwide is an "employer" and a "covered entity" as those terms are defined at 42 U.S.C. § 2000e-2, et seq.

136.    Wright engaged in protected activity when she disclosed to Defendants that it had discriminated against her because of her race and gender.

137.    Defendants retaliated against Wright when they altered the terms of her employment, placed unwarranted restrictions on her work hours and location, removed her duties, and subjected her to increased scrutiny following her protected conduct.

138.    Wright engaged in protected activity when she filed an internal complaint of discrimination in or about May 2017.

139.    Wright engaged in protected activity when she disclosed her concerns about discrimination at PBR to A Just Cause.

140.    Defendants further retaliated against Wright in or about August 2017 when they disciplined her for speaking to A Just Cause regarding Defendants' discriminatory behavior.

141.    These adverse actions raise a reasonable inference of retaliation for Wright's protected activity because they began within six weeks of Wright's formal complaint of discrimination.

142.    Wright sustained substantial monetary and non-monetary damages as the result of Defendants' illegal conduct.

143.    Wright demands such legal or equitable relief as will effectuate the purposes of Title VII, including, but not limited to economic damages (including accrual of

back pay and front pay), compensatory damages, punitive damages, attorneys' fees and costs of this action, equitable relief (including appropriate affirmative action and injunctive relief), and any other relief this Court deems just and equitable.

## COUNT II
### The Equal Pay Act of 1963 ("EPA")
### 29 U.S.C. § 206(d)
### Unequal Pay

144. Plaintiff incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

145. Wright is an "employee" as the term is defined in 29 U.S.C. § 203(e).

146. WME and PBR are "employers" as the term is defined at 29 U.S.C. § 203(d).

147. Wright is a female.

148. Wright's comparators, including Rodd Granger, Sean Gleason, and several other members of the executive leadership team, are male.

149. As a member of the Executive Leadership Team, Wright performed work that required at least equal, if not more skills, effort, and responsibility, under similar working conditions as those of her male comparators.

150. Wright's male comparators are compensated at a higher salary range than Wright.

151.   Defendants failed to compensate Wright comparable to employees who are of the opposite sex, work in the same establishment as Wright, perform work equal to the work performed by Wright, and retain positions that required equal skill, effort, responsibility and is performed under similar conditions as compared to Wright.

152.   As the direct and proximate result of Defendants' violation of 29 U.S.C. § 206(d), Wright was caused to suffer damages.

153.   Defendants ignored Wright's multiple complaints about her pay disparity and also ignored Wright's requests that Defendants rectify her pay disparity.

154.   Defendants knowingly and willfully set Wright's pay at a level that was substantially below her male colleagues who performed the same work.

155.   Wright is entitled to damages in an amount to be determined at trial.

156.   For violations of 29 U.S.C. § 206(d), Wright demands such legal or equitable relief as provided by 29 U.S.C. § 216(b), including, but not limited to, the following:

   a.   Promotion;

   b.   Economic damages including front and back pay;

   c.   Reasonable attorneys' fees and costs;

   d.   Liquidated damages; and

   e.   Any other relief that this Court deems just and equitable.

## PRAYER FOR RELIEF

Plaintiff Wright prays this Honorable Court for the following relief:

1.      Judgment against Defendants in an amount of any wages, salary,

employment benefits, or other compensation denied or lost to Wright,

including economic damages, liquidated damages, compensatory

damages, and punitive damages to be determined at trial;

2.      Re-employment, reinstatement, promotion, front pay, or other equitable

relief;

3.      Pre-judgment interest;

4.      Interest due on unpaid wages;

5.      A reasonable attorney's fee and the costs of this action;

6.      Reasonable expert witness fees; and

Any other relief this Honorable Court deems just and proper to award

Respectfully submitted,

_____  11/30/17

Tanique Wright 17019 Blue Mist Grove
Monument, CO 80132

tanique_wright@yahoo.com

EEOC Form 161-B (11/16)

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

To: Tanique M. Wright
17019 Blue Mist Grove
Monument, CO 80132

From: Denver Field Office
303 East 17th Avenue
Suite 410
Denver, CO 80203

☐ *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 541-2017-01839 | Christopher D. Padilla, Supervisory Investigator | (303) 866-1336 |

*(See also the additional information enclosed with this form.)*

NOTICE TO THE PERSON AGGRIEVED:

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

☐ More than 180 days have passed since the filing of this charge.

☒ Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

☒ The EEOC is terminating its processing of this charge.

☐ The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

☐ The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court WITHIN 90 DAYS of your receipt of this Notice.** Otherwise, your right to sue based on the above-numbered charge will be lost.

☐ The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

**Elizabeth Cadle,**
**District Director**

SEP 0 1 2017

*(Date Mailed)*

Enclosures(s)

cc: **Rodd Granger**
**COO**
**PROFESSIONAL BULL RIDERS, INC.**
**101 W Riverwalk**
**Pueblo, CO 81003**